FILED
2013 Nov-20  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **FREDERICK RUSSELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-CV-04330-RDP** |
| | } | |
| **SEALING EQUIPMENT PRODUCTS** | } | |
| **CO., INC., et al.** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment of Sealing Equipment Products Co., Inc. (Doc. # 51).  On October 1, 2013, the court issued an Order notifying Plaintiff of his right to file affidavits or other materials in opposition to the motion and to notify him of the consequences of a failure to respond.  (Doc. # 54).  Nonetheless, Plaintiff has failed to respond to Defendant's Motion.

**I.      Facts**[1]

Defendant SEPCO is a manufacturer of sealing products in Alabaster, Alabama.  (Doc. # 53-2).  Plaintiff Russell was hired by Defendant on January 30, 2006 as a manual machinist in the Mechanical Seals Department. (Doc. # 53-1 at p. 27).   Glenn Clark hired Plaintiff and was his supervisor.  (Doc. # 53-1 at pp. 27-8).

---

[1] In light of Plaintiff's failure to respond to Defendant's properly supported Motion for Summary Judgment, the facts set forth by Defendant are undisputed.  *See Patton v. City of Hapeville, Ga.*, 162 F. App'x 895, 896 (11th Cir. 2006) (providing that "the district court properly held that the defendants' statement of undisputed facts filed with their motion for summary judgment were admitted when Patton failed to respond to the statement of facts in accordance with the Federal Rules of Civil Procedure and the Local Rules[ ]").

Defendant has a Harassment Policy, which prohibits any form of harassment and contains an internal complaint procedure.  (Doc. # 53-2 at ¶ 3 and Ex. 1).  Plaintiff received a copy of the Harassment Policy and internal complaint procedure at the time he was hired.  (Doc. # 53-1 at pp. 32-4).

On the day Plaintiff was hired, Clark told him that he could not bring his personal tools to work. (Doc. # 53-1 at pp. 138-39).  However, Jimmy Huggins and Greg Lovett were allowed to bring their tools to work.  (Doc. # 53-1 at pp. 153-55).   Plaintiff did not ask Clark about bringing his own tools to work even though Lovett brought his toolbox in.  (Doc. # 53-1 at p. 155).  Plaintiff was provided tools for some jobs, and had to ask for tools for other jobs.  (Doc. # 53-1 at pp. 145-46, 149, 178).  Plaintiff claims that he sometimes ordered tools from the company but they never showed up, despite the fact that when other employees ordered tools they got them "every time."  (Doc. # 53-1 at pp. 146-48).   However, the Rule 56 evidence demonstrates that some of the tools Plaintiff ordered (inserts) were kept in stock by others, and Plaintiff merely had to ask them for that particular tool.  (Doc. # 53-1 at pp. 149-50, 177-78).  Plaintiff admits he had no problem obtaining tools from others in his department (Doc. # 53-1 at pp. 149-50), and there was never a time that Plaintiff could not perform his job because he did not have his own tools or tools were not provided.  (Doc. # 53-1 at p. 179).

Plaintiff also contends that he was not assigned the same amount of overtime as others in his department.  (Doc. # 53-1 at pp. 110-11).  However, he has been unable to identify any particular dates that he believes he should have been assigned overtime, but was not.  He was aware that his co-workers were working overtime because they did not clock out when he did and work was done over the weekend.   (Doc. # 53-1 at pp. 115, 127-29).  Russ Perry, a Caucasian employee in the

department, also did not receive the same amount of overtime as did other employees. (Doc. # 53-1 at p. 114). Nevertheless, the Rule 56 record shows Plaintiff worked overtime in January 2010 (7.5 hours) and in May 2010 (8.25 hours). (Doc. # 53-1 at pp. 117-21 and Ex. 15; Doc. # 53-2 ¶ 4 and Ex. 2).

Plaintiff complains that there were discussions in the department that he was not a part of, and that he would frequently receive instructions from co-workers rather that his supervisor. (Doc. # 53-1 at pp. 157-59). Clark explained to Plaintiff that he used Owenby to give instructions because he (Owenby) has been employed a long time. (Doc. # 53-1 at p. 162). Plaintiff believed that sometimes when these other employees gave him work, it was not really his job and they were trying to get Plaintiff to do their work. (Doc. # 53-1 at pp. 171-72). Plaintiff admitted that other Department employees, such as Perry, Reba Henson and Ray Hyde were also excluded from Department discussions. (Doc. # 53-1 at p. 160).

Plaintiff further testified that a hose was leaking on the manual lathe machine that he operated and, although he had asked for it to be repaired, months went by with no repair. (Doc. # 53-1 at pp. 181-82, 184, 186-87). Plaintiff complained to Clark about the leaking hose and Clark advised him to talk to his co-worker, Owenby, about how to fix it. (Doc. # 53-1 at pp. 188-89). Owenby was not able to resolve the problem. When Plaintiff again complained again to Clark about the hose, Clark told him he had put in a request to purchase a new hose. (Doc. # 53-1 at pp. 189-90, 192-93). In fact, a purchase order for the replacement coolant hose was issued on June 17, 2009. (Doc. # 53-1 at pp. 195-97; Doc. # 53-2 ¶ 5 and Ex. 3).

After repeated unsuccessful attempts to obtain the parts from the manufacturer to fix the leak, Defendant had a custom hose made to fix the problem. (Doc. 53-2 ¶ 6). The hose had been leaking

for roughly three months before it was repaired.  (Doc. # 53-1 at pp. 199-200).  During the time the hose was leaking, coolant leaked onto the floor around Plaintiff's work area and got on his clothes. (Doc. # 53-1 at pp. 188, 190).  Plaintiff never requested to work on a different lathing machine while the coolant hose was broken.  (Doc. # 53-1 at pp. 203-05).

Plaintiff also complained generally about fumes from the coolant burning his eyes and nostrils.  However, everyone was exposed to the same fumes because the coolant flowed freely from an open source onto the machine.  (Doc. # 53-1 at pp. 207-10, 214-15).  The coolant is heavily diluted with water and is used on all lathing machines in the department.  (Doc. # 53-1 pp. 210-11). The leaking coolant also affected the operation of a control panel, another issue that took a long time to repair.  (Doc. # 53-1 pp. 240-41, 248-49).  Eventually, the entire control panel of Plaintiff's machine was replaced.  (Doc. # 53-1 p. 249-50).  Plaintiff claims he was the only employee who had these maintenance problems with his or her machine.  (Doc. # 53-1 p. 251).

On April 28, 2010, Plaintiff met with the Plant Manager, Mike Evers and expressed the following concerns about his employment: (i) no one showed him where anything was when he was hired and he was not given tools to use; (ii) tools he requested were given to other employees and he had to get the tools from them; (iii) he received work instructions from co-workers instead of directly from Clark, his supervisor; (iv) repairs to his machine took a long time; (v) he did not have the opportunity to work overtime; and (vi) he wanted the chance to do other things.  (Doc. # 53-1 pp. 205-07, 370-72, 385).

Evers invited Clark to join he and Plaintiff for this discussion, and Clark informed Plaintiff that the same tools for his machine were used for other machines, and so when he ordered new tools, he ordered enough for the whole department to use and wanted them to be kept in a centralized

4

location.  (Doc. # 53-2 ¶¶ 8-9).  Clark also explained that, for a while, no one was getting overtime due to the economic slow-down.  (Doc. # 53-1 pp. 113-14; Doc. # 53-2 ¶ 10).  When overtime was available, Owenby, Huggins or Blythe were chosen by Clark to work because they could operate the manual lathe that Plaintiff used, and also were able to operate more efficient machines that Plaintiff did not know how to operate.  (Doc. # 53-1 pp. 112-13, 116, 174; Doc. # 53-2 ¶ 11).

The coolant hose on Plaintiff's machine had been repaired for at least several months before the April 28 meeting.  (Doc. # 53-1 pp. 206-07; Doc. # 53-2 ¶ 12).  As to the question of Plaintiff receiving instructions from co-workers, Clark explained that, because operations by Owenby and Huggins were often the first step in building a part, he would give them instructions for the whole part, and they would pass along the instructions to others once they finished their piece of the process.  (Doc. # 53-2 ¶ 13).  Evers and Clark explained to Plaintiff that Clark is in the shop every day and that Plaintiff could come directly to Clark with questions.  (Doc. # 53-2 ¶ 14).

At no time during the April 28 meeting did Plaintiff complain that he was being discriminated against because of his race.  (Doc. # 53-1 pp. 369-70; Doc. # 53-2 ¶ 15).

Blythe, who primarily operated a partially automated, computerized lathing machine known as the EZ Trak, resigned on June 2, 2010.  (Doc. # 53-1 pp. 255-58; Doc. # 53-2 ¶ 16).  Although Owenby and Huggins had used the EZ Trak on occasion, it was their jobs to operate other computerized machines.  (Doc. # 53-1 pp. 255-56).  Therefore, Clark asked Plaintiff if he would be interested in running the EZ Trak after Blyth's resignation.  (Doc. # 53-1 p. 260).  Plaintiff responded that he was willing to work on the EZ Trak but that he didn't know how to program it.  (Doc. # 53-1 p. 261).  Clark told Plaintiff that he would ask Huggins to show him how to program it.  (Doc. # 53-1 p. 261).  Clark gave Plaintiff the first choice to run the EZ Trak machine, but also told Plaintiff that

if he did not like the EZ Trak, he could go back to the manual machine.  (Doc. # 53-1 p. 261).
Plaintiff began learning the EZ Trak machine and was able to use its manual functions to fabricate
some parts.  (Doc. # 53-1 p. 269).

Clark later met with Plaintiff, Huggins and Owenby and instructed Huggins to train Plaintiff
on the EZ Trak while Clark was vacation.  (Doc. # 53-1 p. 262).  While Clark was on vacation,
Huggins told Plaintiff that he did not know anything about the EZ Trak and refused to train Plaintiff.
(Doc. # 53-1 p. 263).

When Clark returned, Plaintiff complained that Huggins had not trained him. Clark told
Plaintiff they would hire somebody to train him, but for now to just do the best he could.  (Doc. #
53-1 pp. 279-80).  Plaintiff read the EZ Trak catalog and manual and gained some understanding of
the machine and was able to make some parts on it.  (Doc. # 53-1 pp. 280-81).  Evers decided that
two employees should be trained on the EZ Trak and that, going forward, Plaintiff would operate the
manual lathe and the EZ Trak.  (Doc. # 53-2 ¶ 17).

Plaintiff was given a $2.00/hour raise on July 19, 2010. (Doc. # 53-2 ¶ 18).  Plaintiff had the
opportunity to work overtime on the EZ Trak and worked 58.5 hours of overtime between June 2010
and August 2010.  (Doc. # 53-1 pp. 121-23 and Ex. 15; Doc. # 53-2 ¶ 4 and Ex. 2).  After the April
28 meeting with Evers and Clark, he had no further complaints about overtime.  (Doc. # 53-1 pp.
372-73).

On August 9, 2010, Lovett was hired to fill the second EZ Trak operator position.  (Doc. #
53-2 ¶ 19).  Plaintiff saw Huggins showing Lovett how to pull up files on the EZ Trak machine.
(Doc. # 53-1 pp. 265, 267, 278).

Plaintiff was out of work for a week from August 16-20, 2010, for his mother's funeral. When he returned, he saw Huggins and Owenby "showing [Lovett] how to keep notes on how to mash this button and make it do this" on the EZ Trak machine.  (Doc. # 53-1 pp. 281, 329-30). Plaintiff asked Clark why he was not being trained.  Clark responded that he would make sure Huggins showed Plaintiff what he knew and would bring in somebody to train both Lovett and Plaintiff.  (Doc. # 53-1 p. 282-83).

After speaking with Clark, on August 30, 2010, Plaintiff approached Evers and told Evers that he would rather go back to working on the manual lathe.  (Doc. # 53-1 pp. 291-92).  Evers explained to Plaintiff that he did not mind him working mostly on the manual lathe, but that he needed Plaintiff to learn the EZ Trak.  (Doc. # 53-1 p. 292).  Evers discussed Plaintiff's concerns with Clark, and Clark committed to getting Plaintiff up to speed on the EZ Trak.  (Doc. # 53-2 ¶ 20).

That same day, Clark arranged for Huggins to train Plaintiff on  the EZ Trak.  (Doc. # 53-1 p. 294). Plaintiff told Clark that Evers had told him he could work on the manual lathe for now and learn the EZ Trak later.  (Doc. # 53-1 pp. 294-95).  Clark asked if Plaintiff was refusing work. Plaintiff responded no, "could you let me go back to doing what I'm doing?"  (Doc. # 53-1 p. 295). Clark told Plaintiff to return to the manual lathe and he would talk to Evers.  (Doc. # 53-1 p. 296). Plaintiff was upset that Clark had initially told him it was his choice whether or not to operate the EZ Trak and then told him that he no longer had a choice.  (Doc. # 53-1 p. 299).

On September 7, 2010, Plaintiff, Clark and Evers met to discuss what Clark viewed as Plaintiff's failure to  cooperate in training for the EZ Trak.  (Doc. # 53-1 pp. 300, 304, 337).  Evers assured Plaintiff that he was going to train on the EZ Trak, and that they would get someone in to do that training.  (Doc. # 53-1 p. 304).  Evers and Clark informed Plaintiff that he no longer had a

choice about not working on the EZ Trak because the company needed a backup.  (Doc. # 53-1 pp. 305-06).  Nevertheless, Plaintiff informed them he would rather stay on the manual lathe.  (Doc. # 53-1 pp. 306-08).  At no time during the meeting with Evers and Clark did Plaintiff ever state that he thought he was being treated differently because of his race.  (Doc. # 53-1 pp. 369-70; Doc. # 53-2 ¶ 21).

Within a day or two of the September 7, 2010 meeting, Evers apologized to Plaintiff for pushing him about training on the EZ Trak.  (Doc. # 53-1 pp. 319-21).  Evers told Plaintiff he could return to working on the manual lathe, but that at some point he would be required to learn how to use the EZ Trak.  (Doc. # 53-1 pp. 320-21).  Plaintiff admits that after this one-on-one meeting with Evers, all of his then existing concerns about his employment had been addressed.  (Doc. # 53-1 p. 339).

As noted in more detail below, Plaintiff resigned his employment on January 25, 2011.  (Doc. 53-1 p. 365).  At no point after the one-on-one with Evers and up to the time Plaintiff resigned did either Evers or Clark tell Plaintiff it was time to start the EZ Trak training.  (Doc. # 53-1 pp. 314, 321).  Nor did Plaintiff tell them he was ready to train on the EZ Trak.  (*Id*.).  Moreover, Defendant never imposed any discipline, such as a written warning, suspension or demotion, as a result of Plaintiff's refusal to participate in training on the EZ Trak machine.  (Doc. # 53-2 ¶ 22).

On November 1, 2010, Plaintiff filed an EEOC charge alleging race and age discrimination, and retaliation. (Doc. # 53-1 pp. 107-08 and Ex. 14).

On or about January 19, 2011, in front of Clark and Ray Hyde, Reba Henson accused Plaintiff of sexually harassing her.  Hyde agreed that Plaintiff had been sexually harassing Hensen.  (Doc. # 53-1 pp. 341-42, 355).  Plaintiff denied the accusation and asked Clark why he did not "stop

8

them from saying this." (Doc. # 53-1 p. 342). According to Plaintiff, Clark was standing beside him and smiling and laughing. Plaintiff was not amused by the exchange. (Doc. # 53-1 pp. 343-44).

Plaintiff acknowledges that everyone in the room knew that he had not been sexually harassing Henson. (Doc. # 53-1 p. 349). He was friends with Henson and Hyde, frequently joked with them, and never had any problem with them. (Doc. # 53-1 pp. 349-50). Other than his immediate denial, Plaintiff did not make any complaint about this incident to anyone in management. (Doc. # 53-1 p. 364). No action was taken by Defendant against Plaintiff in response to the "accusation." (Doc. # 53-1 pp. 360-61).

Plaintiff does not have any evidence that either Henson or Hyde was aware of his EEOC charge or an upcoming mediation of the charge. (Doc. # 53-1 p. 360). Nor does Plaintiff have any evidence suggesting that Henson made the accusation at the suggestion or direction of anyone in management. (Doc. # 53-1 pp. 359-60). Plaintiff claims that Henson's accusation of harassment was retaliatory, but candidly admits that he has no factual support to that effect. (Doc. # 53-1 pp. 386-87).

Plaintiff's last day of work with Defendant was January 19, 2011. (Doc. # 53-1 pp. 34-6). Thereafter, on January 25, 2011, Plaintiff tendered his voluntary resignation. (Doc. # 53-1 p. 365).

Plaintiff filed a claim for unemployment benefits with the Alabama Department of Industrial Relations which was denied on the grounds that he voluntarily resigned his employment without good cause connected to work. (Doc. # 53-1 pp. 401-04 and Ex. 22). Plaintiff appealed the denial of unemployment benefits to a hearing officer. A telephone hearing was conducted by the Hearings and Appeals Division during which Plaintiff appeared, gave testimony and was represented by counsel. (Doc. # 53-1 p. 404 and Ex. 22). During the telephone hearing, Plaintiff asserted that he

9

resigned because he was falsely accused of sexual harassment by a co-worker.  (Doc. # 53-1 p. 402 and Ex. 21 at pp. 9, 19, 22).  The Hearing Officer determined that Plaintiff failed to take advantage of Defendant's grievance procedure to address the sexual harassment accusation, and that his resignation was without good cause.  (Doc. # 53-1 p. 403-04 and Ex. 22 thereto).

Plaintiff filed his Complaint in this action on December 27, 2011.  (Doc. # 1).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the

10

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## III.    Analysis

For the reasons stated below, the court concludes that there are no material issues of fact in this case and Defendant is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56.

### A.    Plaintiff's Amended Complaint

In his Amended Complaint, Plaintiff asserts the following claims:

1.    Count I - Race Discrimination in Violation of Title VII;
2.    Count II - Race Discrimination in Violation of 42 U.S.C. § 1981;
3.    Count III - Retaliation under Title VII;
4.    Count IV - Constructive Discharge; and
5.    Count V - Mental and Emotional Distress.

(Doc. # 31).  The court addresses these claims out of their listed order.

### B.    Plaintiff's Mental and Emotional Distress Claim Fails as a Matter of Law

Although titled a "Mental and Emotional Distress" claim, in actuality Count V is an outrage claim.  "The tort of outrage requires that: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) ... the distress was severe. With respect to the conduct element, this Court has stated that the conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"  *Gunter v. Huddle*, 724 So.2d 544, 547 (Ala.Civ.App. 1998)  (quoting *Harris v. McDavid*, 553 So.2d 567, 569-70 (Ala. 1989)); *see also American Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1980) (recognizing the tort of outrage as actionable in Alabama).

11

"The Alabama Supreme Court has clarified that 'outrage is a very limited cause of action that is available only in the most egregious circumstances.'" *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F.Supp.2d 1336, 1354 (M.D. Ala. 2009) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993)). The cause of action requires that both the conduct and the emotional distress be extreme. "[T]his standard has been applied 'strictly' by the Alabama Supreme Court." *Edwards*, 603 F.Supp.2d at 1354 (quoting *Saville v. Houston County Healthcare Auth.*, 852 F.Supp. 1512, 1541 (M.D. Ala. 1994) (quoting *Continental Cas. Ins. Co. v. McDonald*, 567 So.2d 1208, 1211 (Ala. 1990))). "So circumscribed, in fact, is the reach of the tort of outrage that the Alabama Supreme Court has allowed such claims only in three limited circumstances: 'cases having to do with wrongful conduct in the context of family burials; cases where insurance agents employed heavy-handed, barbaric means to coerce a settlement; and cases involving egregious sexual harassment.'" *Garrett v. Stanton*, 2008 WL 4701215, *8, n.17 (S.D. Ala. 2008) (quoting *Carter v. Harris*, 64 F.Supp.2d 1182, 1194 (M.D. Ala. 1999)).

Plaintiff simply has not presented evidence of either the type of extreme and outrageous conduct required to establish a cognizable outrage claim, nor has he put forth evidence showing the requisite level of severe emotional distress. The words of Judge Myron H. Thompson apply here: "While the defendants' behavior here may have been insensitive or made [Plaintiff] uncomfortable, []he has presented no evidence suggesting that their conduct reached such an intolerable level." *Hendrix v. Chambers*, 2008 WL 509633, *5 (M.D. Ala. 2008) (citing *Am. Road Serv. Co. v. Inmon*, 394 So.2d 361, 364-65 (Ala.1980) (no outrage recovery for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities")). Therefore, Defendant is entitled to summary judgment on Plaintiff's "Mental and Emotional Distress" claim asserted in Count V.

12

### C.      Plaintiff's Constructive Discharge Claim Fails as a Matter of Law

Plaintiff's discrimination and retaliation claims are addressed below.  Before discussing those, the court addresses Plaintiff's claim that Defendant not only discriminated and/or retaliated against him, but that it also made the conditions of his work so intolerable as to constructively discharge him.  First, as noted below, the Rule 56 evidence does not support Plaintiff's claim that he was the subject of retaliation or discrimination.  Second, even if that were not the case — that is, even if Plaintiff could present a triable issue as to discrimination and/or retaliation, he has wholly failed to present substantial evidence of a constructive discharge.

A "[c]onstructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citations omitted).  Whether an employee's working conditions were so intolerable is an objective question. *See Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1363 (11th Cir. 1994) ("A claim for constructive discharge requires the employee to demonstrate that the work environment and conditions were so unbearable that a reasonable person in that person's position would be compelled to resign.").  "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, a plaintiff must produce substantial evidence that conditions were intolerable." *Akins v. Fulton County*, 420 F.3d 1293, 1299–1300 (11th Cir. 2005).

 Here, this court concludes that the conditions shown by Plaintiff do not meet the high burden established by the Eleventh Circuit to establish a constructive discharge. *See, e.g., Poole v. Country Club of Columbus*, 129 F.3d 551, 553 (11th Cir. 1997) (reversing grant of summary judgment where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"); *see also Wardwell v. Sch. Bd.*, 786 F.2d 1554, 1558 (11th Cir.

1986) (holding that no constructive discharge occurred where the female plaintiff was not given a promotion, the promotion went to a less-qualified male, and the plaintiff was given additional duties requiring her to work longer hours).

Plaintiff admitted in his deposition that all of his complaints about his working conditions were addressed by Defendant months before his resignation. The final straw that compelled Plaintiff to resign was the sexual harassment accusation made by Reba Henson. Plaintiff denied the accusation, and Defendant took no action against Plaintiff related to the accusation. Plaintiff never complained to management that the accusation had been made. A constructive discharge will generally not be found if the employer is not given adequate time to remedy the situation. *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Nothing about the handling of Henson's accusation would have compelled a reasonable person to resign. Neither life nor the law favor quitters — particularly quitters who do not give their employer a chance to remedy a perceived wrong. But even if that adage did not apply here, Plaintiff simply has fallen far short of establishing any facts necessary to prove a constructive discharge. Therefore, Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim.

### D.   Plaintiff's Race Discrimination Claims Fail as a Matter of Law

As the Eleventh Circuit has explained, "[b]oth § 1981 and Title VII 'are subject to the same standards of proof and employ the same analytical framework.'" *Bryant v. Jones*, 575 F.3d 1281, 1296, n. 20 (11th Cir. 2009); *see also Sims v. Coosa County Bd. of Educ.*, 2008 WL 4080769, at *4 (M.D. Ala. 2008) ("The elements of § 1981 race discrimination claim in the employment context are

the same as a Title VII disparate treatment claim.") (citing *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)).  Thus, as the substantive analysis for these claims is the same, it is appropriate to discuss contemporaneously whether Plaintiff has met this standard with respect to both his Title VII and § 1981 claims.

Where, as here, a plaintiff relies upon circumstantial evidence of discrimination and retaliation under Title VII & § 1981, courts apply the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Crawford v. Carroll*, 529 F.3d 961, 975–76 (11th Cir. 2008). Under this analysis, once a plaintiff has established a prima facie case for discrimination or retaliation, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason'" for the challenged action. *Crawford*, 529 F.3d at 976 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the employer does so, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Id.* (citations omitted).

To prevail under Title VII or § 1981, evidence must be presented that is "sufficient to create an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).  A plaintiff can establish that inference by showing: "(1) he was a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside the protected class more favorably." *Crawford*, 529 F.3d at 970.

The Eleventh Circuit has held, with respect to a disparate treatment claim, that "an 'adverse employment action' includes 'termination, failure to hire, or demotion.'"  *Blue v. Dunn Const. Co., Inc.*, 453 Fed.Appx. 881, 884 (11th Cir. 2011) (quoting *Crawford*, 529 F.3d at 970).  "An employer's conduct falling short of those actions 'must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment

15

opportunities, or adversely affect his or her status as an employee.'" *Blue*, 453 Fed.Appx. at 884 (citing *Crawford*, 529 F.3d at 970). "With regard to the level of substantiality required, the plaintiff must demonstrate that he 'suffered a *serious and material* change in the terms, conditions, or privileges of employment.'" *Blue*, 453 Fed.Appx. at 884 (citing *Crawford*, 529 F.3d at 970–71) (emphasis in original).

Many of the issues about which Plaintiff complains do not rise to the level of an adverse employment action. *See, e.g., White v. Hall*, 389 Fed. Appx. 956 (11th Cir. 2010) (more difficult assignments not adverse); *Belt v. Alabama Historical Comm'n*, 181 Fed. Appx. 763 (11th Cir. 2006) (minor changes in job duties including suspending authority to order inventory and requiring reports to go through supervisor were not adverse employment actions).  And as will be seen below, as to the single employment action that may be actionable, Defendant has articulated a legitimate, non-discriminatory reason for its actions, and Plaintiff has not shown that reason was a pretext for race discrimination.

### 1.      Refusal to Allow Plaintiff to Use Personal Tools is Time Barred

The refusal to allow Plaintiff to bring his personal tools to work occurred in 2006.  (Doc. # 53-1 pp. 138-39).  The longest statute of limitations applicable to § 1981 claims is four years. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).  This case was filed in 2011.  Therefore, any claim over the refusal to allow Plaintiff to bring in personal tools is time-barred under § 1981.

### 2.      Tools Ordered by Plaintiff Were Not Provided

Plaintiff asserts that although he ordered tools for his job, they were not provided, while other unidentified workers ordered tools that were provided.  (Doc. # 53-1 pp. 146-48).  However, as Plaintiff candidly admits, he was able to obtain tools by asking other employees for them, which was

not a problem.  (Doc. # 53-1 pp. 149-50, 177-78).  Plaintiff also admits that there was never a time that he was unable to perform his job because tools were not available.  (Doc. # 53-1 p. 179). Plaintiff simply has not shown an actionable change in the terms or conditions of Plaintiff's employment.

### 3.        Denial of Overtime

Although a denial of overtime would involve an actionable adverse employment action, Plaintiff was unable to identify any occasions where similarly situated employees outside his protected class were given overtime that *he was qualified to perform*.  (Doc. # 53-1 pp. 115, 127-29). Plaintiff admits that the employees he believes were working overtime were qualified to work on machines for which he was not qualified.  (Doc. # 53-1 pp. 113-13, 116, 174; Doc. # 53-2 ¶ 11). Plaintiff also admits that after he received training on an additional machine (the EZ Trak), he received overtime in February and May 2010. (Doc. # 53-1 pp. 117-21; Doc. # 53-2 ¶ 4 and Ex. 2). Therefore, Plaintiff simply cannot establish a prima facie case on this issue.  Moreover, Defendant articulated a legitimate non-discriminatory reason for the difference in treatment, *i.e.,* the employees who received more overtime were qualified to operate machines Plaintiff was not qualified to operate.  (Doc. # 53-2 ¶ 11).  Plaintiff has not attempted to show this reason is a pretext for discrimination.

### 4.        Receipt of Instructions from Co-Workers

Plaintiff asserts a claim that he was excluded from discussions with Clark, his supervisor, about work planning and he received instructions from co-workers, rather than Clark. (Doc. # 53-1 pp. 157-59).  However, Caucasian employees also received instructions from co-workers and were excluded from discussions with Clark about work planning.  (Doc. # 53-1 p. 160).  The Rule 56

17

evidence shows that the difference in treatment was based on seniority.  (Doc. # 53-1 p. 162). Plaintiff admitted that there was nothing wrong with Clark passing on instructions via others.  (Doc. # 53-1 p. 171).  This is particularly the case where those who passed on the instructions were working "upstream" in the production process of building a particular part. (Doc. # 53-2 ¶ 13).  Not only does this issue not rise to the level of an actionable adverse employment action, Plaintiff cannot demonstrate that he was treated less favorably than others outside his protected class.   Moreover, Defendant has articulated a legitimate, non-discriminatory reason for communicating instructions in this manner which Plaintiff has not established is a pretext for discrimination.

### 5.    Repairs to Manual Lathe and Exposure to Coolant Fumes

A coolant hose on the manual lathe which Plaintiff operated broke, causing him to be exposed to coolant liquid and fumes.  The leaking coolant also affected the operation of  a control panel. (Doc. # 53-1 pp. 240-41, 248-49).  Plaintiff complains that it took Defendant three months to repair the machine.  (Doc. # 53-1 pp. 181-82, 184, 186-89).  The undisputed evidence is that Plaintiff's co-worker attempted, but was unable, to repair the hose.  Defendant made repeated efforts to obtain a new part from the manufacturer, and eventually, repaired the hose and the control panel. (Doc. # 53-1 p. 249-50).  Plaintiff never asked to move to another machine and, in any event, even if there had not been a leak, Plaintiff would have been exposed to the coolant fumes anywhere in the department because the coolant flows freely from an open source onto the machine.  (Doc. # 53-1 at pp. 207-10, 214-15).

This change in work conditions is not actionable because it is not sufficiently serious and material.  However, putting that aside, the Rule 56 evidence is that whenever Plaintiff complained that his machine needed repairs, a maintenance employee would attempt to fix it.  (Doc. # 53-1 pp.

249-50).  Moreover, Plaintiff cannot identify any other employee who had similar problems with their machines whose machine was fixed more quickly. (Doc. # 53-1 p. 251).  Therefore, Plaintiff cannot establish a prima facie case of discrimination as to any failure to repair the manual lathe.

### 6.    Alleged Failure to Train

Plaintiff alleges that he was not properly trained on the EZ Trak machine, but that a white employee, Greg Lovett did receive training.  Blythe, who primarily operated the EZ Trak, resigned on June 2, 2010.  (Doc. # 53-1 pp. 255-58; Doc. # 53-2 ¶ 16).  Clark asked Plaintiff if he would be interested in running the EZ Trak after Blyth's resignation.  (Doc. # 53-1 p. 260).  Huggins was instructed to train Plaintiff on the EZ Trak, but failed to do so.  Huggins told Plaintiff that he did not know anything about the EZ Trak.  (Doc. # 53-1 p. 263).  Plaintiff complained to Clark that Huggins had not trained him, and Clark responded that they would hire somebody to train him, but "for now" he should do the best he could.  (Doc. # 53-1 pp. 279-80).  Plaintiff taught himself how to perform some tasks on the EZ Trak.  (Doc. # 53-1 pp. 280-81).  Once he started learning the EZ Trak, Plaintiff received a $2.00 per hour raise and began receiving overtime.  (Doc. # 53-1 pp. 121-23 and Ex. 15; Doc. # 53-2  ¶¶ 4, 18 and Ex. 2).

Thereafter, Defendant decided that two employees should be trained on the EZ Trak. (Doc. # 53-2 ¶ 17).   Lovett was selected for the second EZ Trak operator position.  (Doc. # 53-2 ¶ 19). Around this time, Plaintiff told the Plant Manager that he would rather go back to working on the manual lathe.  (Doc. # 53-1 pp. 291-92).  Evers explained to Plaintiff that he did not mind him working primarily on the manual lathe, but that he needed Plaintiff to learn the EZ Trak.  (Doc. # 53-1 p. 292). Plaintiff was upset because Clark had initially told him it was his choice whether or not to operate the EZ Trak and then told him that he no longer had a choice.  (Doc. # 53-1 p. 299).

When Evers and Clark explained that the company needed a backup operator for the EZ Track, Plaintiff again informed them he would rather stay on the manual lathe.  (Doc. # 53-1 pp. 305-08).

This alleged failure to train is not an actionable adverse employment action.  First, Plaintiff has not established that any similarly situated employee outside the protected class received training that he did not receive.  Second, Defendant had given Plaintiff a raise and was in the process of having Plaintiff and Lovett trained when Plaintiff declined the training.[2]  Simply put, Plaintiff has failed to establish a prima facie disparate treatment claim as to an alleged failure to train.

### E.      Plaintiff's Retaliation Claim Fails as a Matter of Law

To establish a Title VII or § 1981 retaliation claim based on circumstantial evidence, the plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is a causal connection between the two events.  *See Crawford*, 529 F.3d at 970; *see also Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (applying the same three-part test to retaliation claims under § 1981 and Title VII).

Plaintiff can only establish the first element of his retaliation claims.  Without question, Plaintiff's EEOC charge constitutes protected conduct.[3]  Plaintiff filed his EEOC charge on November 1, 2010.  (Doc. # 53-1 pp. 107-08 and Ex. 14).  But that is as far as Plaintiff's evidence of retaliation goes.  Here, the only alleged adverse action Plaintiff alleges occurred after he filed his EEOC charge was the sexual harassment accusation against him made by Reba Hensen.  (Doc. # 31 at ¶ 67).  However, this is not an adverse "employment" action.  Defendant took no action against

---

[2] Again, Plaintiff has inexplicably claimed he did not receive for discriminatory reasons.

[3] Plaintiff testified that, prior to filing his EEOC charge, he did not make any complaints to Defendant about race discrimination.  (Doc. # 53-1 at 369-70).

Plaintiff because of Hensen's accusation.  He was not disciplined, nor was he reprimanded.  And Plaintiff made no complaint about the fact that the accusation was made. He simply quit.  (Doc. # 53-1 at 350-64).   "[The Eleventh Circuit has] not explicitly recognized retaliatory co-worker harassment as an 'adverse employment action' for retaliation purposes." *Terrell v. Paulding County*, 2013 WL 4779697 (11th Cir. September 9, 2013) (citing *Lewis v. U.S. Dep't of Labor*, 368 Fed. App'x 20, 30 (11th Cir. 2010) ("[W]e have not explicitly recognized a retaliation claim based on a hostile work environment.").  Moreover, even assuming such an accusation is actionable, "[m]ere ostracism in the workplace is not grounds for a retaliation claim...." *Manatt v. Bank of Am.*, 339 F.3d 792, 803 (9th Cir. 2003). *See also Burlington*, 548 U.S. at 68 (requiring actionable employer conduct to be "significant," rather than "trivial," emphasizing that "petty slights or minor annoyances that often take place at work").  Plaintiff has not shown that the accusation was "anything more than a petty slight or minor annoyance." *Cobb v. City of Roswell, Ga. ex rel. Wood*, 2013 WL 4046578 (11th Cir. August 12, 2013) (citing *Burlington,* 548 U.S. at 68). Therefore, Plaintiff cannot establish the second element of his prima facie case.

Finally, even if the sexual harassment allegation could be considered an adverse employment action, Plaintiff cannot establish the third element, causation.  To establish causation, Plaintiff must show that the alleged retaliator was aware of his "protected activity" and "the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), abrogated on other grounds by *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Although Plaintiff testified that the accusation occurred around the time the

mediation of his EEOC charge was scheduled, he presented no evidence that Hensen, the accuser, was even aware of the EEOC charge or that the mediation was to occur.[4]

## IV.     Conclusion

For the foregoing reasons, Defendant is entitled to judgment as a matter of law on all of the claims asserted in Plaintiff's Amended Complaint and Defendant's Motion for Summary Judgment is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this _____20th_____ day of November, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[4] For the reasons explained in Defendant's brief in support of summary judgment, an alternative basis for granting summary judgment as to Plaintiff's § 1981 claim is that he is collaterally estopped from arguing the sexual harassment accusation compelled him to resign.  (*See* Doc. # 52 at 28-29).